AMENDED DECISION ON PLAINTIFFS' MOTION TO STRIKE
This Amended Decision is being filed to correct the following:
 1. On page 1, entitled I, Discovery Responses: The second sentence reads "Dr. Stuart has responded to interrogatories, has supplemented those interrogatories pursuant to court order and testified at a deposition." That sentence should now read as follows: Dr. Stuart has responded to interrogatories, has supplemented those interrogatory answers pursuant to Court order and testified at a deposition.
 2. On page 7, second paragraph, last sentence reads as follows: "She did testify that she did not the exact time when she ordered the blood." That sentence should now read as follows: She did testify that she did not know the exact time when she ordered the blood.
 3. On page 14, the following sentence should be added after the citation of Manning v. Bellafiore. That sentence should read as follows: The same attorney representing Dr. Stuart represented Dr. Bellafiore in the Manning case.
 4. On page 17, second paragraph, fourth sentence which read: "Accordingly, the Court finds only reasonable sanction short of entering a default against Defendant." should *Page 2 
read as follows: Accordingly, the Court finds only one reasonable sanction short of entering a default against Defendant.
The remaining contents of the decision filed on April 26, 2010, remain the same. *Page 1 
 DECISION ON PLAINTIFFS' MOTION TO STRIKE
Plaintiffs move to strike the second supplemental answers to interrogatories filed by Defendant, Susan Stuart. D.O. They were filed:
 1. less than a month before trial;
 2. after all the all expert opinions and the basis for their opinions had been disclosed;
 3. after counsel traveled across the country, incurring great expense, to depose more than fifteen expert witnesses; and
 4. a matter of days after Plaintiffs dismissed their claims against Co-Defendant, Women Infants' Hospital (WIH).
For the reasons set forth in this Decision, the Court grants Plaintiffs' motion to strike and imposes the additional sanction on Dr. Stuart that she pay the reasonable costs and fees incurred by Plaintiffs' in connection with the filing and prosecution of this motion.
 I Discovery Responses
The claims against the Defendant, Dr. Stuart, are centered around her treatment of the newborn infant, Lilly Pearce. Dr. Stuart has responded to interrogatories, has supplemented those interrogatories pursuant to court order and testified at a deposition. She has provided no additional disclosures concerning her version of the events surrounding the four hours that she managed Lilly's care since testifying at her deposition on October 15, 2008. Now, with the trial *Page 2 
date approaching, she has filed second supplemental interrogatory answers that significantly modify all of her previous responses. In her new filing, Defendant makes substantive changes as to her account of her treatment of Lilly. Plaintiffs move to strike her recent responses to interrogatories 18, 20, 21, 22, 26 and 27 to the extent that they seek to modify previous disclosures made by Dr. Stuart.
In addressing this issue, the court will first focus on portions of her previous answers to interrogatories 18, 21 and 22. Dr. Stuart's multiple responses to those interrogatories, coupled with her deposition testimony, sufficiently demonstrate the significance of the changes she now seeks to make and the magnitude of the discovery violations.
Interrogatory 18 specifically asked her to disclose her recollecton of the following:
 "Any and all conversations you had with any person concerning the care and/or treatment of Lilly Pearce from September of 2005 to date, excluding conversations with your attorney, and with respect to each conversation, please state to the best of your recollection:
 a. the person with whom you had each conversation;
 b. the time and date of each conversation;
 c. the content of each conversation."
This interrogatory was particularly important because it would require her to disclose the time and substance of each conversation she had with Dr. Padbury, Chief of Pediatrics, WIH. Dr. Stuart can be expected to argue that she relied upon advice received from Dr. Padbury in formulating her plan of care for Lilly.
In her initial answer to interrogatory 18, Dr. Stuart referred to her communications with Dr. Padbury. She identified the time of the conversations by using the happening of other events as a point of reference. In particular, she stated that she spoke to him after receiving the CBC (complete blood count) test results. She stated: ". . . I also spoke with Dr. James Padbury, Chief of Pediatrics at Women Infants' Hospital, immediately upon Lilly's delivery, when she *Page 3 
exhibited signs of a respiratory problem, and again upon receiving the results of Lilly's CBC which reflected a low hemoglobin count. . . ." (Answer 18.)
She provided this response to interrogatory 22: ". . . I called Dr. Padbury, Chief of Pediatrics at Women Infants' Hospital, at Lilly's birth to let him know that she appeared to have issues which required specialized care, and a plan for transfer was immediately initiated and carried out. . . ." (Answer 22.)
In interrogatory 21, she was asked:
 "Did you have any plan(s) of care for the plaintiff Lilly Pearce? If so, please state:
 a. A full and complete description of each plan of care;
 b. When you arrived at each plan of care;
 c. The reasons for each plan of care;
 d. The bases and information you relied upon for your choice of each plan of care;
 e. The precise manner in which you implemented each plan of care;
 f. Whether at this time you consider each plan of cae to have been appropriate and within the standards of care, stating your reasons therefore."
 Initial Answer 21: An objection is interposed upon the advice of counsel insofar as this interrogatory is overly broad and unduly burdensome, comprising of at least seven separate interrogatories. An objection is also asserted to the term, "plan(s) of care," in that it appears to be a term of art which is inapplicable to the facts at issue. Further objection is asserted to the extent that this interrogatory improperly attempts to shift the burden of proof from plaintiffs to this defendant. Without waiving these objections, I endeavored to assess, diagnose and treat Lilly to the best of my ability. At all times, my care of Lilly Pearce was within, if not exceeded, the pediatric standard of care.
Upon receipt of the initial interrogatory answers, Plaintiffs filed a motion to strike the objections and compel responsive answers to both interrogatories (and to others not reproduced in this decision). On July 3, 2008, this Court ordered defendant to supplement her answers to interrogatories, which she did on September 29, 2008. *Page 4 
 Supplemental Answer 21: Please see my many and extensive answers to plaintiff's interrogatories directed to me which lays out virtually everything I did for Lilly and my reasoning therefore, which is what I presume is meant by plan of care. Prior to Lilly Pearce's delivery, I was not under the impression that her delivery was an urgent case. As Lilly was handed off to me after the delivery, I noticed that she was covered with (green) meconium and was apparently experiencing some difficulty breathing as evidenced by a grunting sound. Concerned about potential respiratory issues I placed Lilly on positive and expiratory pressure (peep) and ordered a chest X-ray and a blood gas. Then, I contacted Dr. Padbury as referenced in interrogatory no. 18. After Lilly was cleaned and brought to the nursery, I noticed that she was pale in color. In response I ordered IV antibiotics, CBC, repeat blood gas. While in the nursery Lilly was observed to have appeared to stop breathing by a nurse, who then rubbed Lilly's back to stimulate her. This resulted in Lilly appearing to resume breathing. This occurred while I was outside of the Nursery, immediately following that discussion, the nurse told of the episode and she was either continuing or once again, rubbing Lilly's back. I surmised that these were apneic episodes possibly representing seizure(s). Accordingly, I administered Ativan in an attempt to prevent repeat seizures and placed an endotracheal tube to secure the airway. When I received the CBC results, I called Dr. Padbury back to inform him that Lilly was anemic, and Dr. Padbury requested a blood transfusion. When the WIH transport team arrived they performed the blood transfusion and transported Lilly to Women Infants' Hospital. (emphasis added).
In her supplemental answer to interrogatory 18, she adds: "Shortly after receiving the first blood gas results and CBC results, I called Dr. Padbury back to advise him that the WIH transport team was required, to which Dr. Padbury readily agreed, and he said he would immediately dispatch a transport team."
Again, she references the timing of her conversations with Dr. Padbury on events rather than a clock. She continues to state that the CBC test results were the trigger that prompted her to call Dr. Padbury about a blood transfusion and transport. Dr. Stuart never refers to ordering an additional blood test to confirm the CBC results. She never mentions an H H (hemoglobin *Page 5 
and hematocrit) test at all. (From that, the plaintiffs had every reason to believe that the H H test was merely an additional blood draw and played no role in her decision to transfuse the baby because she already made that decision before 10:10 when the H H results were returned.)
Plaintiffs deposed Dr. Stuart on October 15, 2008. At her deposition she explained that she ordered an ABG (blood gas test) after the baby was delivered to address the perceived respiratory problem. The results from that test included an incidental finding of a low hemoglobin level. She ordered the CBC to confirm that incidental finding. After receiving the results of that CBC, at 9:04 a.m., she spoke to Dr. Padbury and steps were taken to order blood for a transfusion and to transport the baby.
Her deposition testimony was consistent with her interrogatory answers to the extent that testified that she had ordered an ABG test shortly after the delivery to address the respiratory problem. The ABG test revealed an incidental finding of a low hemoglobin level, and she ordered the CBC to confirm that incidental finding.[1]
Plaintiff's counsel addressed a series of questions to Dr. Stuart at her deposition to establish a chronology of events.[2]
At her deposition, Defendant testified that shortly after Lilly's birth, she called the special care nursery at WIH and spoke to Dr. Padbury. (Dep. p. 130, lines 14-18.) She explained that she called him because the baby "had exhibited respiratory distress in the setting of meconium which could potentially mean meconium aspiration and those sorts of cases can turn badly very *Page 6 
quickly and I wanted to just alert him that we were dealing with a situation down at South County." (Dep. p. 144, lines 22-24, p. 145, lines 1-5.)
He recommended that she order a blood gas test and a second one an hour later to see where the trend was going. (Dep. p. 130, lines 23, 24; p. 132, lines 1-7; p. 135, lines 7-12.) She testified that the first blood gas test was either drawn at 8:20 or the specimen was received in the lab at 8:20. (Dep. p. 136, lines 16, 17; p. 136, lines 18-20; p. 147, lines 4-8.) She clearly stated that the first blood gas test revealed an incidental finding that the baby had a low hemoglobin level. (Dep. p. 188, lines 19-23.)
 "Q. And according to this answer (referring to her interrogatory answers), that blood gas revealed as an incidental finding that Lilly had a hemoglobin of six which was well below normal; am I right so far?
 A. So far.
 Q. You go on to state, (in interrogatory answers) "I immediately ordered a C BC to confirm that this was a valid test result and further investigated the low value as well as called Dr. Padbury to report it to him," correct?
 A. Yes." (Dep. p. 135, lines 13-24.)
Because the blood gas test results revealed a hemoglobin level of 6.1 and because the baby appeared pale, she ordered a CBC to confirm the incidental finding. She stated:
 "The first blood gas indicated that the hemoglobin was low and that's not a general way that you would obtain a hemoglobin is through the blood gas, that is — that's not what you would order to determine anemia, and the CBC revealed that it correlated with the blood gas result so that's how I determined that the baby was anemic, through the CBC." (Dep. p. 189, lines 15-22.)
 "Q. And so at least by the time the CBC was back, since you already had the blood gas result, these results were suggesting to you that your patient had lost a significant amount of blood, correct? A. Correct." ((Dep. p. 189, lines 23, 24, p. 190, lines 1-3). *Page 7 
She was unable to provide the exact time when the blood was drawn for either the blood gas test or the CBC. However, Dr. Stuart testified that she received the blood gas result by about 8:34 and the CBC result around 9:05 (later corrected to 9:04).
After reviewing the CBC results, she spoke to Dr. Padbury about the need for a transfusion and transport. She asked him about the amount of blood she should order and then placed the order for the blood. Counsel for Plaintiffs asked her a question based upon the understanding that the blood arrived at 10:15 a.m. She did not disagree with that assumption. (See Dep. p. 211.) She did testify that she did not the exact time when she ordered the blood.
 "Q. When did you order the blood?
 A. That I don't recall. It was after I had spoken with Dr. Padbury. He had recommended 15 — 15 cc's per kilo for volume and I had called the blood bank to specify the volume. I wasn't sure how much they would need or how much is stored for infants, if it's a bag or a half of a bag, so I specified 45 cc's." (Dep. p. 211, lines 16-23.)
Taking the deposition testimony in conjunction with her supplemental interrogatory answers, it is clear that Dr. Stuart claimed that she made the decision to transfuse the baby and transport her to WIH after receiving the CBC results which were returned at 9:04. That was the test that triggered her decision.
This case was initially scheduled for a date certain trial to commence in late February, 2010. This Court vacated that date on October 15, 2009 and rescheduled the trial for April 26, 2010. During the past several months, the parties have engaged in exhaustive and costly discovery. Plaintiffs have proceeded with the understanding that they had flushed out Defendant's version of events and could rely upon her disclosures. *Page 8 
On March 30, 2010, less than thirty days before trial, Dr. Stuart served Plaintiffs with an unsigned set of so-called Second Supplemental Interrogatory Answers. Defendant later executed the answers.
Now, she claims that she did not rely on the CBC and did not contact Dr. Padbury after receiving those results. Instead, she claims for the very first time that she ordered the H H to confirm the CBC results and contacted Dr. Padbury after receiving the H H test results.
 Second supplemental answer to interrogatory 18 . . . Upon receiving the CBC results, which indicated a hemoglobin and hematocrit (H H) of 6.0/17.7, I immediately ordered a confirmatory H H, with reticulocyte count, to ensure that the first hemoglobin result was accurate. When the extremely low hemoglobin was confirmed, at or around 10:10 a.m., I promptly called the WIH NICU back to advise them that the WIH transport team was required but now because Lilly had severe anemia (not a respiratory problem). . . .
 Second supplemental answer to interrogatory 20 . . . Sometime after 9:04 a.m., Pat Rondomanski wrote down on a piece of paper the initial ABG results and a hemoglobin of 6 (from what I now know to have been taken from the CBC), which she gave me after receiving report of phone from the SCH laboratory. . . . I ordered a repeat ABG at 9:30 a.m., consistent with WIH's instructions, and a confirmatory H H with reticulocyte count at 9:43 a.m. to confirm, or debunk, the initial low hemoglobin result of 6.0 Upon learning of the confirmatory H/H at 10:10 a.m., I called back the WIH NICU to report the hemoglobin results and Lilly's severe anemia. I was advised to give Lilly a blood transfusion of 15cc per kilo, and a transfer team would be on its way. I had blood ordered at about 10:15 a.m., as demonstrated on the SCH Blood Bank requisition sheet. In the interim while waiting for the blood to arrive, I had discussions with the nursing staff at SCH to get the blood transfusion pump, tubing and equipment ready. At that point, I was informed that the hospital did not have a policy on how to transfuse infants/newborn, and they would find a nurse with experience transfusing infants to set up the equipment. . . .
 Second supplemental answer to interrogatory 21 . . . When I received the confirmatory H H, with retic, results at 10:10 a.m., I called the WIH NICU back to inform them that Lilly was severely *Page 9 
anemic, and was instructed to order a blood transfusion at a rate of 15 cc per kilo for Lilly. I had the blood ordered, at or about 10:15 a.m. In the interim I had discussions with the SCH nursing staff to get the blood transfusion equipment ready. At that point I was informed that the hospital did not have a policy on transfusing newborns, but they would get a nurse in the hospital with experience transfusing infants to perform the transfusion. . . .
 Second supplemental answer to interrogatory 26 . . . I did not make a diagnosis for her other than that she was severely anemic once the confirmatory H H results were recorded at 10:10 a.m. She was stained with meconium at delivery, and she had Apgar scores of 8 and 8. She appeared to be grunting at birth, and respiratory concerns were addressed. In the course assessing her, the hemoglobin from the CBC was reported to me, along with the first ABG result (see Second Supplemental Answer No. 20) by Pat, and at 10:10 a.m. the confirmatory H H, validated that Lilly did, in fact, have a very low hemoglobin count. . .
 Second supplemental answer to interrogatory 27 . . . Lilly's hemoglobin from her CBC and the repeat H H with retic demonstrated a very low hemoglobin, suggesting that she was extremely anemic and had lost blood.
 II Discussion
On the eve of a potentially lengthy and complex medical malpractice trial, the Court is faced with an issue of paramount importance, not only to the parties involved, but to the Bench, the Bar, and the community who rely on the fairness of our judicial system. The Court finds that Defendant, Dr. Susan Stuart, and her attorneys have engaged in conduct which violated the Defendant's discovery obligations, under the Rhode Island Rules of Civil Procedure and under court order. Clearly, the violations reveal a cavalier and arrogant attitude toward discovery obligations and court orders. However, the timing of the violations brings the abuses to another level. The Court concludes that Defendant and her attorney acted deliberately to gain tactical advantage. *Page 10 
Dr. Stuart only treated the infant plaintiff, Lilly Pearce for a period of approximately four hours, from her birth at South County Hospital (SCH) at 7:40 a.m. on May 28, 2006 to 11:20 a.m. on that same date. By 11:20 a.m., a team from WIH arrived to administer a blood transfusion and to transport her to WIH for further treatment. Dr. Stuart did not have to sift through voluminous records reflecting months or years of treatment in order to recreate the timeline and events surrounding her involvement with the newborn plaintiff.
There is no question that Lilly came into this world requiring immediate and urgent care and treatment. Plaintiffs served Dr. Stuart with the summons and complaint in this case on November 29, 2006, only six months after Lilly's birth.[3]
Within six months and possibly much sooner, Dr. Stuart had actual notice that she would be required to recount the details of the treatment she provided to Lilly.
In 2008, after she initially failed to provide adequate responses to interrogatory answers, Dr. Stuart filed supplemental answers pursuant to court order. Shortly thereafter, she added detail that was missing from her interrogatory answers when she testified under oath at her deposition. Dr. Stuart had no reasonable basis to withhold any pertinent information or to wait until the eve of trial to craft a description of events not previously revealed.
The Rules of Civil Procedure and court order mandated that Dr. Stuart to provide an accurate timeline of what she did, when and why she did it. This case involves, in pertinent part, her decision to transfuse the baby and to transfer her to WIH. On the eleventh hour, less than a month before trial, she has provided detailed information inconsistent with her prior responses, *Page 11 
which responses were relied upon by the Plaintiffs in preparing this case for trial. The Court rejects each and every excuse provided by her attorney to account for her recent epiphany.
To provide their clients with effective representation, it was incumbent on Plaintiffs' attorneys to obtain Dr. Stuart's version of the care and treatment she rendered to Lilly. Specifically, they needed her account of the particular diagnostic tests she ordered, when and why she ordered them, when she received and reviewed the results, and what actions, if any, she took based upon the results she reviewed.
Plaintiffs' counsel also needed to determine Dr. Stuart's version of her communications with personnel at WIH, and in particular, with the Chief of Pediatrics at WIH, (Dr. Padbury). Plaintiffs were entitled to know the time and substance of each conversation, if and why she initiated it and what, if anything she did following each conversation.
Until now, Dr. Stuart stated that she had sufficient information at 9:04 a.m. to recognize the need to transfuse the baby and transfer her to WIH. Two years ago, at her deposition, she testified that she spoke to Dr. Padbury after receiving the 9:04 CBC test results to inquire as to the quantity of blood she should order for the transfusion. She never even mentioned the H H test results that were returned at 10:10 which would lead the plaintiffs to believe that she did not view them as necessary or significant to her decision to contact Dr. Padbury about a transfusion and transport.
Instead of ordering the CBC to confirm the incidental finding of low hemoglobin in the ABG result, she now claims that she ordered an H H to confirm the CBC results. This is a significant change in her version of events, and there is absolutely no reasonable excuse for her failure to disclose it earlier. Without apology or reasonable explanation, Dr. Stuart now says that every act she performed as a result of the 9:04 a.m. test results was really performed as a result *Page 12 
of the 10:10 test results. She moves everything she did in connection with the decision to transfuse and transport Lilly ahead over an hour. Dr. Stuart suggests for the first time that she ordered the blood at 10:15, rather than receiving it at that time.
Dr. Stuart made her recent disclosures within days after Plaintiffs dismissed their claims against WIH. Counsel for Dr. Stuart scoffs at any suggestion that one act had anything to do with the other. Plaintiffs argue otherwise and contend that Dr. Stuart will attempt to shift the blame to the "empty chair" previously occupied by WIH by changing the timing of certain conversations she allegedly had with Dr. Padbury. Defense counsel dismisses this argument by pointing out that Dr. Stuart has no intention of criticizing the role of WIH in the care and treatment rendered to Lilly. This argument fails. At oral argument on this motion, counsel conceded that his client would argue that her communications with Dr. Padbury were evidence of her due care because she sought his advice and followed it. Quite conceivably, this would be an easier defense to present in the absence of WIH as a Co-Defendant. This Court accepts Plaintiffs' contention that had Dr. Stuart made her recent disclosures earlier, it would have impacted on their decision to dismiss the claims against WIH.
There appears little question that there was an additional blood test that came back at 10:10 a.m. This test is referred to in the discharge summary. If those results, rather than the 9:04 a.m. CBC results triggered Dr. Stuart's decision to transfuse the baby and transport her to WIH, she had every opportunity to say so earlier.
At the hearing on Plaintiffs' motion to strike, counsel for Dr. Stuart made a vigorous and sanctimonious argument to explain his client's failure to reference this test in the four years since Lilly's birth. He said that his client did not recall the timeline of the tests she ordered and read and that she had no way of knowing that blood test results were received at 10:10 by merely *Page 13 
reviewing the hospital record because mention of the results was hidden in a foot note and virtually impossible to decipher. The Court rejects this argument based on a review of the hospital record. (See Exhibit A.)[4]
Counsel claims that his client could not have known of the existence of the H H test results until August, 2009 when a laboratory technician from SCH testified about it at her deposition.
Even if Dr. Stuart only became aware of the 10:10 a.m. test results in August 2009, she makes no reasonable excuse for failing to supplement her interrogatory answers at that time. In the same self-righteous style he adopted when arguing that it took four years to decipher the discharge summary, counsel excused his client's failure to supplement her answers after the August 2009. He suggested that she had no obligation to do so since the fact of the test was made available at the August deposition to all parties. In other words, she had no obligation to correct any previous misstatements and had no obligation to provide Plaintiffs with her version of events because they could figure it out for themselves from records and testimony of others. Counsel's interpretation of the Rhode Island Rules of Procedure and his client's obligations under prior court order is unique to him. This Court finds that it is so inconsistent with Dr. Stuart's discovery obligations as to suggest that it may have been made for tactical advantage and not out of a good faith belief in the correctness of the argument.
In the words of former Major League baseball player and manager, Yogi Berra, this appears to be "déjà vu all over again."[5]
The Court cannot overlook the fact that this issue has *Page 14 
surfaced the same week that the Rhode Island Supreme Court issued its decision in another medical malpractice case, KathrynManning v. Peter J. Bellafiore, M.D., Rhode Island Supreme Court, No. 2005-320-A (April, 2010). In Manning, the court affirmed a Superior Court decision granting plaintiff's motion for a new trial following a verdict for the defendant.
The trial justice based his decision, in part, on the defendant's "flagrant discovery abuse(s)." In that case, plaintiff's decedent had a claustrophobic reaction to an MRI/MRA, and he did not complete the test, which exam may have been crucial to enable the doctor to timely diagnose and treat his condition. At trial, Dr. Bellafiore testified that the patient had rejected his frequent offers to administer conscious sedation to him to reduce his anxiety so he could tolerate the test. Dr. Bellafiore had failed to disclose this version of events in either his interrogatory answers or his deposition testimony.
The Supreme Court decision quotes the trial justice in words that could easily apply here.
 "In the midst of a lengthy, hotly contested medical malpractice case, the failure to disclose such an important defense was not only critical, it left the court in the midst of a dilemma for which there was no just resolution (not to mention the disarray to the extensively prepared plaintiffs' case). At trial, the court suspected that the credibility of Dr. Bellafiore would be significantly lessened when such an obvious, pivotal fact was not disclosed in sworn answers. Apparently, the jury did not recognize the gravity of this flagrant discovery abuse. In hindsight, the injustice was never cured. The court only precluded the fact finder in its quest for the truth, when its proper role was to accommodate the fact finder within the confines of the rules and fairness." Manning v. Bellafiore, slip op. at page 13.
It is clear that Dr. Bellafiore's attorney learned little from the trial justice's words in Manning. This decision is necessary not only to assure a fair trial, but also to vindicate the authority of the court, its orders and rules of procedure. It is also necessary to send a louder *Page 15 
message to an attorney who does not appear to appreciate his professional responsibility to show respect and obedience to discovery rules and court orders.
The Rules of Civil procedure were enacted to eliminate a sporting contest and to be "construed and administered to secure the just, speedy, and inexpensive determination of every action. Rhode Island Rules of Civil Procedure, 1. By attempting to change her version of events on the eve of trial, Defendant has done violence to the purpose and scope of those rules. The Court finds a significant violation of the discovery rules. The Court further finds that Plaintiffs will be substantially prejudiced if Defendant is permitted to alter her version of events at this late date.
 III Remedy
The Court must fashion a remedy that adequately responds to the offense and is most fair to the parties. Under Rule 37(b) (2), Rhode Island Rules of Civil Procedure, the court has the discretion to enter an order to sanction a party for failure to comply with discovery orders. That discretion includes:
 . . .
 B. An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting the disobedient party from introducing designated matters in evidence; C. An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or a final judgment dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;. . . .
The Court would not enter a judgment of default where there a less harsh remedy was available.
Certainly, postponement of the trial to give the Plaintiffs an opportunity to meet the new disclosures is not a viable remedy. The Court recognizes that Plaintiffs and Defendants have *Page 16 
deposed more than fifteen experts based upon previous disclosures. To permit the Defendant to change her version of events now would create turmoil that might well involve not only a continuance of the trial, but a need to obtain additional expert opinions and to take additional depositions, involving great delay and tremendous expense.
Beyond delay and expense, the problem cannot be cured by continuance. The Defendant waited until Plaintiffs dismissed their claims against the Co-Defendant, WIH, before revealing her new chronology. That dismissal cannot be undone. Defendant has offered no excuse, however weak, for delaying her new disclosures beyond August 2009. The Defendant seeks to exculpate herself, at least in part, by arguing that she kept Dr. Padbury informed and followed his advice. Suddenly, she has him offering that advice closer in time to the transfusion and transport than she did before. This problem cannot be cured by a postponement.
The Court also recognizes that if Dr. Stuart offers her new version of the facts, she will be subject to impeachment. A party may be impeached and her credibility may be questioned by showing that on some prior occasion she said something inconsistent with her testimony at trial. However, as the trial justice inManning noted, the jury might not recognize the gravity of such a flagrant discovery abuse, and it would be unjust to permit Dr. Stuart to benefit from her deliberate disregard of our rules of procedure and orders of court. It would also encourage further similar violations in the future.
Counsel for the Defendant argues that to preclude his client from offering her new version of the case would be forcing her to take the witness stand and lie. He raised this issue in oral argument on this motion and again in Defendant's supplemental memorandum submitted in opposition to the motion to strike. Defendant states: "In short, plaintiffs' proposed remedies would require the Court to order Dr. Stuart to lie on the stand" which defendant maintains *Page 17 
"violates all tenants of the American judicial system, which is to pursue and cull out the truth." (Defendant, Susan Stuart's Supplemental Memorandum in Opposition to Plaintiffs' Motion to Strike Defendant's Second Supplemental Answers To Interrogatories, April 23, 2010.)
Counsel's attempt to invoke patriotism falls short when the court considers that it was Defendant's attorney himself who assisted Dr. Stuart in preparing the two previous sets of interrogatory answers, and it was that same attorney who accompanied her to the deposition. That same attorney did nothing to correct earlier purported misstatements. It is unfortunate that his profound interest in pursuing and culling out the truth didn't surface before the experts were disclosed, deposed and WIH was dismissed from the case.
The Court cannot merely grant a continuance of the trial date to cure the violations. As argued by Defendant and her attorney, Dr. Stuart maintains that she cannot testify consistent with her previous disclosures without lying under oath. Of course, the Court would never put her in that position nor would the Court encourage perjury. Accordingly, the Court finds only reasonable sanction short of entering a default against Defendant. The Court accepts Plaintiffs request to grant the motion to strike. The Court shall preclude Dr. Stuart from testifying as to the matters contained in the second supplemental interrogatory answers.
 IV Conclusion
The Court grants Plaintiffs' motion and hereby strikes Defendant's second supplemental answers to interrogatories 18, 20, 21, 22, 25, 26, and 27. The Court precludes Dr. Stuart from testifying as to matters contained in her second supplemental interrogatory answers.
As it relates to her involvement in treating Lilly from the time of her birth until the team from WIH arrived, transfused Lilly and transported her, Dr. Stuart's testimony shall be limited to acknowledging statements in her previous interrogatory answers and deposition testimony. She is *Page 18 
hereby precluded from elaborating on those statements if to do so would provide information inconsistent with her previous disclosures or would provide information that should have been revealed pursuant to previous court order.[6]
The Court orders Defendant to reimburse Plaintiffs the reasonable costs and fees associated with filing and prosecuting this motion. The Court will defer conducting a hearing on the reasonableness of any costs or fees sought by Plaintiffs until after the trial is completed or matter otherwise resolved.
Location
[1] It appears undisputed that either a CBC or an H H blood test (hemoglobin and hemocrit) would have been appropriate to confirm that the baby had a hemoglobin/hemocrit problem.
[2] For reasons that have not been explained, Dr. Stuart's orders, which she maintains were verbal, were not documented in the records of South County Hospital or elsewhere. Likewise, it does not appear that her communications with Dr. Padbury, or anyone at Women Infants' Hospital, were documented in the records of either hospital or elsewhere.
[3] Aside from having access to Lilly's records of SCH as an attending physician, the Confidentiality of Health Care Communications and Information Act carves out an exception that would have given Dr. Stuart's attorneys and insurer access to those records without requiring her to obtain a release from the patient. See § 5-37.3-4 Limitations on and permitted disclosures (b) No consent for release or transfer of confidential health care information shall be required in the following situations: . . . (7) To a malpractice insurance carrier or lawyer if the health care provider has reason to anticipate a medical liability action. . .
[4] Based upon counsel's representation that the parties were unaware of the 10:10 test results until a document was revealed at the deposition of a SCH representative, the Court chastised counsel for SCH for his client's failure to disclose the test in its initial discovery responses. This prompted counsel for SCH to provide the Court with a copy of the discharge summary which is included in the hospital record. It was easy to decipher. (See Exhibit A.)
[5] Lawrence "Yogi" Berra, who was known for fracturing the English language, originated this quote in the early 1960's, referring to the multiple times that his teammates, Mickey Mantle and Roger Maris hit back-to-back home runs. Berra, Yogi (1998).The Yogi Book. New York: Workman Publishing.
[6] The court is referring to significant omissions in previous discovery responses.